PACIFIC INDUSTRIES, INC., Plaintiff,

v.

MOUNTAIN INN, INC., Roy Brumfield and Katharine P. Brumfield, Defendants,

J. Orville Cheney, Commissioner of Revenues, State of Arkansas, Intervenor.

No. 519.

United States District Court
W. D. Arkansas,
Fayetteville Division.

Aug. 26, 1964.

802

· Kaneaster Hodges, Newport, Ark., Courtney C. Crouch, Springdale, Ark., for plaintiff.

E. J. Ball, Rex Perkins, Fayetteville, Ark., for Mountain Inn, Inc.

W. B. Putman, Fayetteville, Ark., for the Brumfields.

JOHN E. MILLER, Chief Judge.

This is a diversity action commenced by the plaintiff March 3, 1964, seeking judgment against the defendants in the sum of $130,236.12 and foreclosure of a second mortgage. Plaintiff, Pacific Industries, Inc., (Pacific), is a Texas corporation with its principal place of business in that State and is the corporate successor of Itasca Draperies, Inc., (Itasca), also a Texas corporation with its principal place of business in that State. The defendant, Mountain Inn, Inc., (Inn) is an Arkansas corporation with its principal place of business in Fayetteville, Washington County. The individu-

al defendants, Roy Brumfield and Katharine P. Brumfield, (Brumfield), are citizens of the State of Arkansas and residents of Fayetteville, Washington County.

Plaintiff, Pacific, in its complaint alleged: On or about April 25, 1962, defendant Inn and Itasca entered into a purchase and sale agreement for the sale of certain furniture, fixtures and equipment to be delivered by the plaintiff's predecessor, Itasca, and installed in the hotel and motel operated by the defendant Inn at Fayetteville, Arkansas. The complaint contains a specific description of the furniture, fixtures and equipment shipped to and installed in the Inn under the purchase agreement at a total sales price of $147,188.98. To the purchase price there was added what is described in the complaint as "tax 3%" in the amount of $4,415.67 for a total obligation of $151,604.65.

It was further alleged that the Inn agreed to pay a "Time Price Balance" of $169,873.20 for the property described in the agreement payable in 60 consecutive monthly installments [1] beginning May 28, 1962, in the amount of $2,831.22 and bearing interest after maturity at the highest legal contract rate; that the purchase agreement instrument reserved title in the seller until payment was made in full of the entire debt. That this instrument was sufficient in form as a financing statement, was signed by the seller and purchaser, and was properly filed in the office of the Secretary of the State of Arkansas. That the plaintiff, Pacific assigned and delivered all its interest in the purchase contract instrument to Westinghouse Credit Corporation (WCC). That the individual defendants Brumfield executed an agreement with WCC under the terms of which they personally guaranteed the debt due WCC under the assigned purchase contract; that the individual defendants executed an escrow agreement with WCC under the terms of which they placed

[1]. $169,873.20 added to the initial down payment of $15,160.46 results in total purchase price of $185,033.66.

with the First National Bank of Fayetteville, Arkansas, the following described corporate stock:

20 shares of Union Carbide
45 shares of Standard Oil of New Jersey
30 shares of Westinghouse
10 shares of Kennecott Copper
30 shares of Atchison, Topeka & Santa Fe
12 shares of Morgin Trust
7 shares of Sun Oil
60 shares of General Motors

It also was alleged that the guaranty agreement and escrow agreement were executed to secure the payment of furniture, fixtures and equipment in the assigned purchase contract. That on January 29, 1962, defendant Inn executed and delivered to WCC the second mortgage conveying the following described lands in the City of Fayetteville, Washington County, Arkansas: Lots 2, 16, 17, 18 and 19 in Block 28 in the original town (now city) of Fayetteville, which was to secure the payment of the debt due by the terms of the purchase contract. That the second mortgage was given subject to a first mortgage executed by the defendant Inn to certain individuals as the Trustees for Central States, Southeast and Southwest Areas Pension Fund, Teamsters Union, dated October 1, 1960, and of record in Washington County Mortgage Record Book 545 at page 190, and to a supplemental mortgage between the same parties dated January 1, 1962, to secure an additional $50,000, making the sum due under the first mortgage $725,000.

The complaint further alleged that on or about April 25, 1962, the first mortgagee, Central States, et al., entered into an agreement with WCC, in which it agreed that the furniture, fixtures and equipment sold to Inn by Pacific would remain personal property so that the holder of the above described purchase agreement would have recourse in the enforcement and payment of the debt. That on January 5, 1962, plaintiff entered into an agreement with WCC, and by the terms of which it agreed to guarantee the payment of any contract assigned to WCC and that it would repurchase these con-

tracts in case of default of payment in 60 days. That defendant Inn and individual defendants Brumfield executed an extension of the debt with WCC. That defendant Inn has failed and refused to pay the installments due under the terms of the purchase agreement and the extension agreement, and that WCC demanded that the plaintiff, Pacific, perform its guaranty contract to repurchase the purchase agreement.

On or about March 1, 1964, plaintiff, Pacific, paid WCC the full consideration for the purchase contract, whereupon WCC reassigned and redelivered to the plaintiff the purchase agreement, the guaranty agreement, the escrow agreement, the second mortgage and the mortgage agreement and waiver. The title to these five documents is now in the plaintiff. That the plaintiff elected, as authorized by the terms of the purchase agreement, to accelerate the maturity of all of the installments due under that agreement, and that the corporate defendant Inn and the individual defendants Brumfile are now indebted to the plaintiff in the sum of $130,236.12, together with interest at 6 percent per annum from March 1, 1964. That the purchase agreement provided for the payment of attorneys' fees in the event of litigation to enforce the obligation.

In its prayer plaintiff seeks judgment against the defendants in the sum of $130,236.12 (at the trial plaintiff's attorney stated amount due is $115,483.17), with interest at 6 percent per annum, for any additional sums which plaintiff may be forced to pay to protect its security, for a first lien on all of the described furniture, fixtures and equipment sold by plaintiff's predecessor, Itasca, a first lien on all corporate stock held in escrow by First National Bank of Fayetteville; to have a lien on the real property described in the first and second mortgages subject to the first mortgage; appointment of a commissioner to sell said property and lands, if judgment is rendered in favor of plaintiff and is not paid within a reasonable time fixed by the court, a receiver be appointed to take charge, man-

age and preserve all the above-described property; that any purchaser under a sale of the above described property be decreed to have the right to immediate possession of the property and be given a writ of assistance to be issued by the Clerk of the Court, and that the equity of redemption, as well as all rights or possibilities of dower and homestead, of the individual defendants be foreclosed and barred and that the plaintiff be awarded an attorneys' fee equal to 15 percent of the debt due by the defendant and for costs and all other proper relief.

On April 14, 1964, defendants Brumfield filed their answer in which they admitted the court has jurisdiction of the controversy and the parties, and denied the purchase contract was executed or entered into on April 25, 1962, and affirmatively alleged that the contract was signed by Inn on January 27, 1962, and that it was materially altered by changing the date from January 27 to April 25, 1962. They also alleged that the contract is void as it provides for a charge of interest in excess of that allowed by the law of Arkansas.

Defendants admitted the purchase agreement was assigned by Itasca on or about April 26, 1962, and delivered to WCC; that they signed the alleged guaranty agreement in favor of WCC, but in defense averred that it is void for want of consideration because it provides for interest in excess of the rate allowed by the law of the State of Arkansas.

Defendants also averred that they are not bound by the guaranty agreement because it was special and not general and thus not assignable; admitted they executed the escrow agreement but averred that it is void because of the lack of consideration of the guaranty agreement; admitted the execution and delivery to WCC of the second mortgage of the real property involved; that a waiver was executed by the first real property mortgagee in favor of the second mortgagee, WCC, which provided that the furniture, fixtures and equipment would remain personal property.

The individual defendants in their separate answer admitted that the corporate defendant has not performed the purchase agreement contract, and they averred they are without knowledge as to whether the plaintiff reacquired said contract from WCC. They further alleged that if plaintiff reacquired the purchase contract from WCC, plaintiff acquired no title or property rights therein for the following reasons:

1. That the purchase agreement has been materially altered by the plaintiff and provides for interest at a rate in excess of that provided by law and under the law of Arkansas is absolutely void.

2. That the guaranty agreement executed by the individual defendants is void because it has been materially altered and provides for interest at a rate in excess of that allowed by law; that neither WCC nor Pacific gave any consideration to the individual defendants for their execution of the guaranty agreement.

3. That the escrow agreement is without force and effect because the original purchase contract is void for the reasons given above, and that the guaranty agreement is void for the reasons given above, and that neither WCC nor Pacific gave defendants any consideration for the execution of the escrow agreement.

Defendants in their answer further admitted that plaintiff is entitled to accelerate the payments under the purchase agreement provided that their defenses as otherwise set out are without foundation, and that Inn is in possession of all property described in the complaint except the corporate stock described in the escrow agreement. Defendants denied that the personal property, stocks and bonds and mortgaged real property is in danger of loss by being removed or materially injured, and that the property is insufficient to discharge the debt alleged to be due the plaintiff.

Defendants admitted the contract provides for attorneys' fees but denied that the plaintiff is entitled to an allowance for attorneys' fees. The prayer in the separate answer of the defendants Brumfield is that the plaintiff take nothing and

that the complaint be dismissed and for all other proper relief to which they might be entitled.

Defendant Inn's separate answer contains substantially the same admissions and denials, together with a counterclaim in which it alleged that the plaintiff impliedly warranted that the furniture and fixtures were fit for the purposes for which they were intended; that the warranty has been breached by virtue of the unfitness of the furniture and fixtures, but at the trial the counterclaim was withdrawn and abandoned by Inn.

On April 18, 1964, Pacific filed a motion for the appointment of a receiver, and on April 20, 1964, the court appointed Mr. Charles E. Aubrey, an officer of plaintiff, as receiver of the property of Inn, and required a bond to be posted in the sum of $10,000. The order provided that the receiver operate the hotel-motel business and preserve and conserve the assets of the corporate defendant. It further provided that an inventory of the property be prepared and filed with the Clerk of the Court.

On July 8, 1964, the Commissioner of Revenues, State of Arkansas, sought to intervene. In his petition he alleged that tax in the amount of $4,415.67 collected by the plaintiff, Pacific, had not been remitted to the State of Arkansas or to intervenor whose duty it is to collect it. Intervenor prayed that plaintiff be required to pay the State of Arkansas that sum plus 10 percent penalty, plus interest at the rate of one half of one percent per month from May 28, 1962.

On July 9, 1964, Foremost Dairies, Inc., a corporation, filed a motion to continue the receivership of defendant Inn for the benefit of general creditors. Foremost in its statement in support of its motion stated that Inn is indebted to it in the amount of $1,061.15, said balance due on open account for goods, wares and merchandise sold and delivered to Mountain Inn between February 26, 1964, and April 22, 1964.

On July 10, 1964, defendants Brumfield filed an amendment to their answer in which they admitted that the corporate defendant executed an agreement with WCC in January 1963 amending the terms of the original purchase contract and extending it, but they denied, however, that the extension was executed with WCC by them individually. Defendants further alleged that the guaranty agreement and the escrow agreement are unenforceable in that they were personal and special guaranty agreements in favor of WCC, and that subsequent to the execution of said guaranty agreement the terms of the original contract of sale were materially altered without the consent of the individual defendants. They also adopted the allegations of the original answer, and prayed that the complaint against them individually be dismissed.

At the trial the court allowed the intervenor to dismiss its petition as all taxes due and payable the State of Arkansas had been paid in full.

On July 13, 1964, the case was tried to the court and the parties adduced evidence, ore tenus and documentary. The motion of Foremost Dairies to continue the receivership was considered by the court but action was deferred. At the conclusion of all the testimony the case was submitted and taken under advisement by the court and the parties were requested to submit briefs in support of their respective contentions, which have been received and considered by the court.

The issues as developed by the pleadings, testimony and briefs may be stated generally as follows: (a) Is the primary obligation (conditional sales contract) between Inn and Pacific usurious? (b) Is the personal guaranty and escrow agreement executed by the individual defendants supported by consideration?

## CLAIM OF USURY

The defendants, as heretofore stated, contend that the primary obligation of Inn exacts an amount of interest in excess of that allowed by law and is, therefore, usurious. The defendants cite Arkansas Constitution, Article 19, Sec. 13, which provides:

"All contracts for a greater rate of interest than ten percent per an-

num shall be void, as to principal and interest, and the General Assembly shall prohibit the same by law."

Ark.Stat.Ann., Sec. 68–602 (1957 Repl.), provides:

"The parties to any contract, whether the same be under seal or not, may agree in writing for the payment of interest not exceeding ten (10) percent per annum on money due or to become due."

■ A conditional sales contract, such as that involved in the instant transaction, falls within the above cited constitutional and statutory provisions. As provided in Ark.Stat.Ann., Sec. 68–603:

"No person or corporation shall, directly or indirectly, take or receive in money, goods, things in action, or any other valuable thing, any greater sum or value for the loan or forbearance of money or goods, things in action, or any other valuable thing, than is in Section one [§ 68–602] of this act prescribed."

See, Sloan v. Sears, Roebuck & Co., 228 Ark. 464, 308 S.W.2d 802 (1947); and Hare v. General Contract Purchase Corp., 220 Ark. 601, 249 S.W.2d 973 (1952).

In the instant case the cash or sale price of the furniture and equipment as reflected in the conditional sales contract is $151,604.65. A down payment was credited against the cash sale price in the amount of $15,160.46, resulting in a principal balance of $136,444.19. To the principal balance a finance charge, or time price differential, was added in the sum of $33,429.01. The total amount of the obligation thus after credit of the down payment and addition of the finance charge amounted to $169,873.20. The conditional sales contract further provided that "Buyer agrees to pay the time balance in sixty (60) consecutive monthly installments, beginning on the 28th day of May 1962, and on the same day of each month thereafter. Each installment shall be in the amount of $2,831.22, except the last installment, which shall be $2,831.22, and shall bear interest after maturity at the highest legal contract rate."

■ The finance charge or time price differential is an amount exacted for the forbearance or extension of time for the payment of the principal balance, and is therefore interest as contemplated by the Arkansas Constitution and Statutes. Sloan v. Sears, Roebuck & Co., supra. An examination and comparison of the finance charge and the principal unpaid balance in the instant action, i. e., $33,429.01 on an unpaid principal balance of $136,444.19 for a period of 60 months, reflects an interest rate less than the legal maximum.

■ There is also a provision in the personal guaranty executed by the defendants Roy and Katharine P. Brumfield which provides for an attorneys' fee of 15 percent of the principal obligation. The plaintiff in its brief concedes that such attorneys' fees may not be allowed under the law of Arkansas. Brown v. Merchants & Planters Bank & Trust Co., 202 Ark. 684, 152 S.W.2d 548 (1941). A provision for attorneys' fees, although void, does not per se render an otherwise valid contract usurious. As stated in Brown v. Merchants & Planters Bank & Trust Co., supra, at page 691, 152 S.W.2d at page 551:

"The contract was for compensation for attorneys, and while it was not a proper charge against appellants, it did not make the original contract usurious. This court has frequently held that an agreement for an attorney's fee is void, but that such a provision in a contract does not make the contract usurious. This fee was not paid and the trial court held that it could not be collected."

■ The collection by the seller-obligee of an amount designated and labeled as "sales tax," for which the seller is unquestionably liable to the State of Arkansas normally should not be computed as part of the interest or an exaction for forbearance. Defendant Inn contends that the collection of the item designated

"sales tax" was a sham, and the seller did not intend to pay the state tax. It cites Wilson v. Whitworth, 197 Ark. 675, 125 S.W.2d 112 (1939); Winston v. Personal Finance Co. of Pine Bluff, 220 Ark. 580, 249 S.W.2d 315 (1952); and Strickler v. State Auto Finance Company, 220 Ark. 565, 249 S.W.2d 307 (1952).

However, the court cannot infer that the seller's lack of diligence in paying the tax in the instant case was a subterfuge to collect an amount in excess of the lawful interest rate.[2] When, as in the instant case, conduct on the part of the seller in not remitting the tax to the State Revenue Department is capable of an explanation which, if reasonable, does not create a presumption of bad faith, the court may not properly infer it. In view of the explanation of the delay in paying the tax, the court is of the opinion that neither Itasca nor Pacific intended to charge interest in excess of ten percent, and the primary obligation between Inn and Itasca (Pacific) is therefore not usurious.

## PERSONAL GUARANTY

The plaintiff contends that the personal guaranty [3] executed by the defend-

---

2. The tax was paid to the State of Arkansas on June 4, 1964.

    Ark.Stat.Ann., Sec. 84–3108 (1960 Repl.), provides that a vendor of personal property for use or consumption in this State shall collect the tax and the amount shall be displayed separately upon the instrument evidencing the sale.

3.

### "GUARANTY

"Westinghouse Credit Corporation
933 Penn Avenue
Pittsburgh 22, Pa.

Re: Mountain Inn, Inc.
Fayetteville, Arkansas

"Gentlemen:

"In consideration of you, herein called 'Corporation', purchasing or otherwise acquiring from and/or entering into with the party named above, herein called 'Obligor', conditional sale agreements, trust receipts, chattle mortgages, leases, notes or other obligations or choses in action, herein called 'Contracts', the undersigned and each of them, jointly and severally, do absolutely and unconditionally guarantee to Corporation and its affiliates, the full, faithful and prompt performance, payment and discharge by Obligor of any and all covenants, conditions and obligations provided to be performed by Obligor in any and all such Contracts and/or any and all agreements of Obligor with Corporation now in force or hereafter made.

"Notice of acceptance of this Guaranty is hereby waived. Presentment, protest and demand, and notice of protest and demand of any and all Contracts are hereby waived. Any rights to extension, composition or otherwise under the Bankruptcy Act or any amendments thereof, or under any state or other federal statute are hereby waived. The extensions of the times of payment or the renewal of Contracts or the extensions of the times of performance of agreements or any other compromises, adjustments, or indulgences may be granted to Obligor without notice to undersigned.

"Failure of the Corporation to insist upon strict performance or observance of any of the terms, provisions and covenants of any Contract or to exercise any right therein contained shall not be construed as a waiver or relinquishment for the future of any term, provision or covenant thereof, but, as to the undersigned, the same shall continue and remain in full force and effect. Receipt by the Corporation of payment or payments with knowledge of the breach of any provision of any Contract shall not, as to the undersigned, be deemed a waiver of such breach.

"The liability of the undersigned under this Guaranty shall be primary and in any right of action which shall accrue to the Corporation under any Contract, the Corporation may, at its option, proceed against the undersigned, jointly or severally, together with the Obligor, or may proceed against the undersigned, jointly or severally, without having commenced any action against or having obtained any judgment against Obligor. If any claim against undersigned hereunder

ants Brumfield on January 29, 1962, was an integral part of the negotiations and purchase agreement, which it contends was executed April 25, 1962. Plaintiff, therefore, takes the position that the personal guaranty is supported by sufficient consideration and contends that it was executed as a part of the original negotiations with respect to the purchase of furniture, fixtures and equipment.

The individual defendants contend (1) that the guaranty executed by them was in addition to and as a result of demands and threats made by Itasca and Pacific in telephone conversations in December 1961; (2) that the transaction involving purchase of personal property and services supplied by Itasca was consummated in November of 1961 and not later than the first week of December 1961; and (3) that the personal guaranty was exacted from them by James Collins, President, Pacific Industries, as additional collateral because of a demand made upon Collins by WCC in connection with the financing agreement between Itasca and WCC that he personally guarantee the payment of the purchase price to WCC as set forth in the contract. The individual defendants thus take the position that their individual guaranty of the debt of Inn is without any consideration.

In addition they contend that they executed the personal guaranty because of a threatened breach of contract by Itasca. Mrs. Brumfield in her testimony stated that Collins by telephone threatened to keep his men from returning to the job after the Christmas holidays and from completing the carpet laying and other installations of furniture and equipment unless the Brumfields signed a personal guaranty in favor of WCC. Mrs. Brumfield further stated that the hotel was scheduled to open in January and that when the personnel of Itasca left for the Christmas holidays in December, the job was only one-third to one-half completed. Thus, the defendants take the position that because of economic hardship and threatened breach of contract they were coerced into executing the personal guaranty.

A personal guaranty by an individual to assume or become a surety for the debts of another must be supported by consideration to be enforceable as any other contract must be supported by consideration to be enforceable.

is referred to an attorney for collection, then undersigned shall pay 15% of the amount thereof as an attorney's reasonable fee.

"This Guaranty may be terminated by undersigned serving written notice upon Corporation, but as to all Contracts purchased or acquired and all obligations of the Obligor, contingent or absolute, incurred up to the time of the receipt of such notice or such subsequent effective date as may be stated therein, this Guaranty shall be continuing and unconditional until the same are fully paid, performed or discharged. The Guaranty shall not be discharged or affected by the death of any of the undersigned, but shall bind their respective heirs, executors, administrators, successors and assigns, and the benefits thereof shall extend to and include the successors and assigns of Corporation.

"Dated this 29th day of January, 1962.

WITNESS
/s/ Mollie Renner
/s/ Josephine Burson

/s/ Roy Brumfield
T. Roy Brumfield

WITNESS
/s/ Mollie Renner
/s/ Josephine Burson

/s/ Katharine P. Brumfield
Katharine P. Brumfield

ACCEPTED

WESTINGHOUSE CREDIT CORPORATION

By /s/ J. R. McClester

Witness ————"

In 38 C.J.S. Guaranty § 26b, at pages 1163–1164, it is stated:

"Where the contract of guaranty is made before or at the same time as the principal contract, and both contracts form parts of the same transaction, one consideration is sufficient for both the principal and the collateral contract and there need not be any other consideration than that moving between the guarantee and the principal obligor under the principal contract; and in some jurisdictions this rule is prescribed by statute. In accordance with this rule, where a guaranty of payment of a note is made before or at the time of the execution of the note, the consideration for the note is the consideration for the guaranty, and no further consideration is necessary. So, also, the delivery of property to a third person on the faith of a guaranty of payment is a sufficient consideration for the guaranty; and where a guaranty of a lease is executed before or at the time of the execution and delivery of the lease, the consideration for the lease is the consideration for the guaranty.

"Although a contract of guaranty is executed subsequently to the principal contract, it is regarded as being made at the same time so as to constitute a part of the same transaction and be supported by the same consideration, and not to require a new consideration, where it is executed pursuant to an understanding *had before and is an inducement to the execution of the principal contract;* or where it is delivered before any obligation or liability is incurred under the principal contract; or where it is made pursuant to some provision in the principal contract; or where the principal contract does not become operative until the execution of the guaranty; or where the contract of guaranty expressly refers to a previous agreement between the principal debtor and the creditor which is executory in its character and embraces prospective dealings between the parties." (Emphasis added.)

Thus, requisite consideration to support a personal guaranty agreement may generally be summarized as follows: (a) If executed on or before the execution of a primary debt obligation, it is enforceable if induced by and given in consideration of the primary debt obligation; (b) if executed subsequently to the execution of the primary obligation, it may be enforced if supported by additional consideration either moving to the original obligor or to the guarantor; (c) any detriment incurred by the obligee of the primary debt and which is induced by the guarantor will support the guaranty obligation; and (d) in some instances courts have found consideration which will support a personal guaranty when the guarantor is a stockholder and director of the corporation which incurred the principal debt or obligation without additional further consideration because of the relationship of a guarantor and the corporate obligor.

In the instant transaction plaintiff does not allege that any additional consideration was given in exchange for the guaranty. It does, however, contend that the guaranty is a part of and supported by consideration of the principal debt or obligation, citing Beeson v. LaVasque, 144 Ark. 522, 525, 223 S.W. 355, 356 (1920), in which the court held that a personal guaranty was supported by sufficient consideration because it "was attached to and is part of the original contract." The case recognized the guaranty as an integral part of and executed contemporaneously with the primary obligation. This rule is stated in 24 Am. Jur., Sec. 49, Guaranty, p. 906, as follows:

"If the promise of the guarantor is shown to have been given as part of a transaction or arrangement which included the creation of the guaranteed debt or obligation, it is not essential to a recovery that the promise shall have been supported by a consideration other than that of the principal debt—that is, one and

the same consideration may suffice for both contracts where the contract of guaranty has been entered into at the time of creation of the principal obligation. For example, a guaranty of payment is supported by a consideration where it accompanies and is the inducement of a sale of goods."

The plaintiff also takes the position that the negotiations and transactions between the parties began in November 1961 and continued through and were consummated April 25, 1962, and thus all prior writing and negotiations became merged in the instrument dated April 25, 1962. The plaintiff, in support of its contention that the guaranty dated January 29, 1962, became merged in the instrument dated April 25, 1962, cites and relies upon the following:

Harrower v. Insurance Co. of North America, 144 Ark. 279, 222 S.W. 39 (1920), in which the court at page 281 of 144 Ark., at page 40 of 222 S.W., said:

"It is familiar law that prior oral agreements and antecedent writings forming a part of the negotiations for a contract become merged in the subsequent written contract and are incompetent as evidence for the purpose of enlarging the scope of such written contract. * * * The policy issued and delivered constituted a contract between the parties and all antecedent negotiations and agreements were merged into it." (Citations.)

12 Am.Jur., Sec. 232, Contracts, p. 755, in which it is stated:

"Where the parties intend a writing to be the sole memorial or integration of the contract, the writing embodies the contract and, accordingly, the interpretation of the contract consists of the interpretation of the writing. * * * In the absence of mistake or fraud, a written contract merges all prior and contemporaneous negotiations in reference to the same subject, and the whole engagement of the parties and the extent and manner of their undertaking are embraced in the writing."

The record reflects and the court finds that Itasca in a letter dated November 29, 1961, to Mountain Inn considered the contract consummated on that date. This letter is as follows:

"ITASCA CONTRACT STUDIOS

1511 Bryan Street, Suite 631
P. O. Box 2580
Dallas 21, Texas

"Winslow Taylor
Executive Vice-President                          November 29, 1961

"To: Mountain Inn, Inc.

"Attention: Mr. & Mrs. Roy Brumfield

"As per written commitment to you by Westinghouse Electric Corporation and their oral commitment to us we hereby agree to supply, deliver and install furnishings and fixtures for the Mountain Inn in Fayetteville, Arkansas in accordance with attached schedules and prices and with future schedules and prices to be completed. Any additions, subtractions and changes must be mutually agreed upon by Mr. & Mrs. Roy Brumfield and by Itasca Contract Studios.

Terms: Approximate total amount of sale                $150,000.00 to
                                                       $160,000.00

Down payment    10% of total sale
Balance due and payable in 60 equal and consecutive monthly
installments at interest rate of 4½% per annum add-on.
                              /s/ Winslow R. Taylor."

The testimony is convincing and the court finds that the negotiations with respect to the personal guaranty of the Brumfields and the escrow [4] of Mrs. Brumfield's personal corporate stocks began sometime after the 1961 Christmas holidays. On January 5, 1962, the Vice President of Itasca telegraphed defendant Mrs. Roy Brumfield as follows:

"HI 2–7377

"Mrs. Roy Brumfield

"This is our firm commitment to proceed with financial agreement exactly as outlined in Westinghouse letter to you November 6.[5] Only additional requirement is Escrow arrangement on your personal stocks as per your conversation with Rod Hill this morning. No Escrow on real estate. Mr. Clester, Collins, Hill and self all understand this deal as above. Please approve by return wire for record and our installation men will arrive tomorrow. Will call in morning with information on china and other items.

Win Taylor."

On January 29, 1962, the President of Inn, defendant Roy Brumfield, transmitted the conditional sales contract executed by him on behalf of the corporation to Itasca. This letter recites the exact provisions with respect to the monthly payments and amounts, and reflects that the conditional sales contract itself was executed by Brumfield the 27th day of January 1962. With respect to the contention by Brumfield that the contract was consummated in January and not April, as asserted by the plaintiff, his letter of that date contained the following directions for the insertion of the date on which the first installment under the purchase contract was to be made:

"The date within which the furniture and fixtures is to be installed in the new addition to the Mountain Inn Hotel and the date the first installment of $2,831.22 is to begin are in blank, and you are authorized to complete these blanks by inserting a date for payments to begin which will be on or before 45 days following completion of the installation of the furniture and fixtures and the execution of a certificate of acceptance that the delivery and installation of the furniture and fixtures have been made."

us, the documentary evidence clearly establishes and the court so finds that all of the duties and obligations of the parties had become fixed and were reduced to writing on or before January 27, 1962. The only act remaining as of January 29, 1962, was the insertion of the date of completion of the installation of the furniture and fixtures by the seller with the condition that the first payment begin 45 days after the completion of the in-

4. "ESCROW AGREEMENT
"Westinghouse Credit Corporation
Pittsburgh, Pennsylvania
"Dear Sir:
"This agreement serves to provide an escrow arrangement and personal stocks of Mrs. Roy Brumfield. In purchasing the furnishings for the Mountain Inn, several items of security were pledged by the Mountain Inn and by the Brumfields. In addition, it is understood that the stocks listed on the attached sheet, and forming a part of this memorandum, are a part of the agreement.
"These stocks are assigned irrevocably as pledged collateral to substantiate the monthly payments due over a 5-year period to Westinghouse Corporation. They can be sold in the public market to apply on the payment of this note only in the event that Mountain Inn is three months delinquent in the payment of this note. It is further understood and agreed by the parties that the First National Bank of Fayetteville, Arkansas, is to act as the Escrow Agent for the parties and in the event the indebtedness is paid by the Brumfields, then in that event said agent is authorized to return the stocks to Mrs. Brumfield.
/s/ Katherine P. Brumfield
Mrs. Roy Brumfield
/s/ Roy Brumfield
Roy Brumfield"
(Notarization omitted.)

5. The Westinghouse letter was not offered in evidence. In response to inquiry made by the court to the attorneys, the attorney for Brumfields stated they did not have letter or a copy of it but that it was left in the files of Inn when the receiver took charge. The attorneys for plaintiff made no offer to produce the letter.

stallation of the furniture and equipment. Assuming arguendo that as of January 29, 1962, the parties had not reduced their obligation and financial arrangements to writing, a contract was in existence as of that date because the obligations and duties of the parties had been agreed upon and were fixed. There is no indication in the record that the parties conditioned the execution of the insertion date of the completion of the installation as a condition precedent to the existence of their duties and obligations. If the parties had agreed that the writing itself should be executed by both parties as a condition precedent to their obligations and duties, this would control the instant action.

In Arkansas, as well as in the majority of other jurisdictions, the making of a valid contract requires no writing whatever. See Corbin on Contracts, One Vol., 1952 Ed. As stated in Sec. 31, at page 49:

"So far as the common law is concerned, the making of a valid contract requires no writing whatever; and even if there is a writing, there need be no signatures unless the parties have made them necessary at the time they express their assent and as a condition modifying that assent."

Had the parties contemplated the signing and execution of the written memorandum as a condition precedent to the existence of their obligations and duties, the following principle, of course, would apply:

"On the other hand, the court may be convinced that the parties did not mean to be bound until the formal document is executed, in which case there is no contract until its execution by both parties."

In the instant transaction the evidence conclusively establishes, and the court so finds, that the parties considered their duties and obligations determined and fixed in November 1961. It is apparent that the defendant corporation, Inn, had committed itself to purchase furniture, fixtures and equipment and services in the amount of between $150,000.00 and $160,000.00. The parties had also discussed and agreed upon in detail specific items of furniture and equipment to be furnished by Itasca with leave, however, to make certain substitutions, additions or subtractions. At this point in time the essential requisites of a binding contractual obligation came into existence as the duties and obligations of the parties were definite and certain.

The letter to Mountain Inn from Itasca of November 29, 1961, and the telegram of January 5, 1962, support the conclusion that the parties did not intend the execution of a written memorandum as a condition precedent to the creation of their obligations and duties. Assuming, however, that the written memorandum was essential to bind the parties, the execution by Brumfield on January 27, 1962, contained in detail every essential element of the transaction. Thus, there can be no doubt that the contractual obligations of the parties were in existence and enforceable, definite and certain prior to the execution of the personal guaranty and the escrow agreement by the individual defendants, Roy and Katharine P. Brumfield.

The court finds that the contract between Itasca and Mountain Inn, Inc., was entered into in November 1961 and was complete in all material respects. Under it Itasca sold to Inn and agreed to install the furniture, fixtures, etc. The Inn became liable for the purchase price, the specific amount of which was to be determined upon completion of the installation.

There was introduced into evidence Exhibit X, which is a copy of a guaranty executed by James M. Collins, President of Itasca Draperies, Inc., the predecessor of plaintiff, Pacific. The copy that was introduced into evidence is not dated, but by its terms Mr. Collins became absolutely liable to WCC for any default by Mountain Inn, Inc. The document does show that on March 2, 1964, Mr. Collins paid WCC and the contract was reassigned to the plaintiff as the successor of Itasca.

Pursuant to the November 1961 agreement Itasca began performance of the contract in December 1961 by supplying certain articles of furniture, fixtures and equipment and installation of carpets. The employees of Itasca were on the job until the 1961 Christmas holidays when all of the employees, or a majority, returned to Dallas, Texas, and did not return to the job site at Mountain Inn, Fayetteville, Arkansas, after the holidays. Naturally the Brumfields were very anxious for Itasca to complete the installation, and called Itasca over long distance telephone and requested that it proceed with the installation. In the meantime, Collins had attempted to assign the contract between Inn and Itasca to WCC, but before WCC would accept the assignment and advance to Itasca the money to finance the deal, Collins was required by WCC to execute the guaranty hereinbefore referred to. Therefore, Collins, as President of Itasca, did not desire to proceed with the performance of the November 1961 contract without additional security, and immediately began discussions with WCC and no doubt enlisted WCC's aid in his efforts to obtain the personal guaranty of the Brumfields and the escrow agreement. As a result of the demands made by Itasca through its President and other officers, with the cooperation and help of WCC, upon the Brumfields and the threat of Itasca that it would not complete its contract, the Brumfields were faced with the possibility of a long, ruinous delay and with no legal remedy available against Collins' threatened breach of the contract other than equally ruinous, time-consuming and costly litigation. Therefore, the Brumfields submitted to the economic pressures imposed upon them, and on January 29, 1962, the contract of guaranty was executed and subsequently on April 16, 1962, the escrow agreement was executed.

In Missouri Pac. R. Co. v. Fields Brothers, 134 Ark. 273, 203 S.W. 1036 (1918), the shipper applied to the station agent of the defendant railroad to furnish a common boxcar for the shipment of a carload of apples from Russellville to Little Rock. The defendant refused to accept the apples for shipment in a common boxcar and demanded that the plaintiff ship in a refrigerated car. The shipper paid the freight rate for the refrigerated car and instituted suit for the difference between carriage in a common boxcar and a refrigerated one. Judgment was rendered in favor of the shipper in the trial court, and the Supreme Court of Arkansas, in affirming the judgment, at page 276 of 134 Ark., at page 1037 of 203 S.W. stated:

"They were at the mercy of appellant, and were driven to the necessity of accepting the character of car dictated, or of refraining from shipping their product to the market. It is true, as suggested by appellant, that courts will only enforce contracts, and not make them; but it is also true that courts will not enforce contracts entered into by the coercion of one of the parties. Appellees were entitled to the car ordered, under the agreed statement of facts in this case, upon the payment of the usual freight rate, and therefore have a right to recover any additional freight exacted and obtained by appellant."

The court realizes the possibility that was open to the defendants—attempt to secure another supplier—however, it is not speculation to assume that no other contractor would begin or assume the installation of fixtures and equipment when a prior contract is in existence and disputed. The evidence fails to establish any benefit derived by the individual defendants by virtue of their becoming personally liable as guarantors for the corporate obligation. The individual defendants likewise received no part of the original consideration in the conditional sales contract. The only arguable benefit they derived from the entire transaction is at most an indirect one as officers or stockholders of the Mountain Inn, Inc. This court cannot in equity compel the performance of an obligation exacted in circumstances which

so strongly indicate actual duress and coercion even though it might be established that the personal guaranty was supported by sufficient consideration.

Therefore, in accordance with the above, judgment and decree will be entered in favor of the plaintiff, Pacific Industries, Inc., and against the defendant, Mountain Inn, Inc., for the sum of $115,-483.17, with interest at 6 percent per annum from March 1, 1964, and providing that the plaintiff have a first lien on all furniture, fixtures and equipment furnished to Mountain Inn, Inc., by Itasca Draperies, Inc.; a lien on the real property hereinbefore described, subject to the lien of the first mortgage executed October 1, 1960, and supplemental mortgage dated January 1, 1962, to Central States, et al. That if the amount due hereunder from Mountain Inn, Inc., to the plaintiff be not paid within 20 days from the date of the entry of the judgment and decree, the property shall be sold by a commissioner named in the decree and in accordance with the conditions named in the decree and the law governing the sale of property in the foreclosing of liens.

The decree shall also provide that the receiver heretofore appointed shall submit a formal report as of the date of the sale and that the amount of money accumulated by the receiver as a result of the operation of the property shall be held for credit upon the judgment herein in the event said property does not sell for a sum sufficient to pay the amount due together with court costs and cost of sale. In the event the property does sell for an amount sufficient to satisfy the judgment herein, said funds accumulated by the receiver shall be deposited in the registry of the court until further orders of the court. That the complaint of plaintiff against the defendants Roy Brumfield and Katharine P. Brumfield be dismissed for want of equity; that the personal stock described in the escrow agreement and now in possession of the First National Bank of Fayetteville, Arkansas, shall be retained by said bank in its possession until further orders of this court.

That the plaintiff is not entitled to recover attorneys' fees.

The attorneys for plaintiff shall submit for entry within ten days a precedent for decree in accordance with the above.